Good morning, ladies and gentlemen. We are here for the case of United States of America v. Juvenile Male. Counsel. Thank you, Your Honors. And may it please the Court, my name is Palmer Hubestall. I'm an attorney from Helena, Montana. I represent TJS, Mr. Sutherland, in this matter. As an initial matter, Mr. Ness and I are going to split the time about eight minutes per person, and we'll use four minutes as rebuttal. I would like to begin my argument addressing the law of the case issue. And I would argue to the Court that Judge Pollack's findings, as argued by the government. Pollack. Pollack. Pollack's findings in the previous case, as argued by the government, does not preclude this Court from considering the issues on appeal here. And the basis upon which we make that argument is that under the factors of the Alexander case, when the law of the case doctrine don't apply, that occurs here. In other words. Kennedy. Well, what did we say in our last disposition? That's exactly what you said. You said in the last disposition was that there are changed circumstances, additional facts that make the law of the case doctrine not apply. And what I would do here is simply show to the Court what those factors are that go beyond the Judge Pollack's statement in the previous matter. And counsel, if we assume for a moment that in our most recent disposition that we concluded that the initial findings by our Court did not any longer apply and we're just looking at the second, that is our most recent disposition, what aspects of that disposition do you believe are at this point the law of the case, if any? Well, I think abuse of discretion, for sure. I think that you found that the district judge abused his discretion in finding, making clearly erroneous findings of fact. And I think that is, in and of itself, was enough to reverse. We were concerned, for example, were we not, about the rehabilitative element of this case. Yes. And its companion case. Yes. And in this case, do I understand correctly that both your client and your compadre's client over there are in martial hold? Is that correct? That's exactly right, Your Honor. And are there any rehabilitative services available to either of these people during the time that they're in martial hold? I suspect that realistically they don't. Well, don't suspect. Do you know whether there are any rehabilitative services available when you're in martial hold? I do not know that. All right. That's fine. You answered the question. Okay. Don't guess about facts. I won't guess about facts. Did Judge Haddon purport to make findings about their current situation? I should limit it to your client for the moment. But did he purport to make any findings about your client's situation in terms of rehabilitative services? Yes. Did he note that your client was being held in martial hold? Yes, he did. And what relevance did he deem that to have to the rehabilitative function? I think that the relevance to that aspect was simply that. Are you answering what the relevance was or are you answering the question of what Judge Haddon said? What the relevance was. I think Judge Smith was asking you about Judge Haddon's decision. Okay. What did he say the relevance was of the martial hold? He did not. My recollection is that he did not say that the relevance of the martial hold had any to do with it. If Judge Haddon found no relevance to the fact that your client was being held in a martial hold, could his factual determination possibly be accurate? No. Because if he's held in one kind of a facility that has no rehabilitative services, at least from my understanding of the record, versus what might be available in either an adult or a youth facility, and he analyzed it on that basis. In other words, in a situation where your client is not held, can those facts be accurate? No. Does that bear in any way on this case? Absolutely. And in what way? Well, the rehabilitative purposes and requirements of the Federal Juvenile Delinquency Act. That is one of the factors that the court has to consider. If we were to find that Judge Haddon had what's clearly erroneous in his findings about the rehabilitative aspects of this case because he didn't deal with the reality of where this young man was being currently held, what right under our case law or under U.S. statutory law would we have to reverse his determination about adult status? Well, I think you would have full right. He abused his discretion. If he made clearly erroneous findings of fact as to the rehabilitative aspect of the juvenile's current incarceration. That's as to any one of the components required for a determination of whether someone should be tried as a juvenile? Yes. Yes. Well, the youngest of these so-called juveniles is now 18. He's 19 now. Yeah. The older one is in his 20s. So what, realistically, what difference does it make whether there's a rehabilitation program in a county jail or wherever they're presently being housed? The question of whether a person is to be tried in the adult court or the juvenile court depends on a whole bunch of factors, some of which you've mentioned, statutory and rehabilitation possibility is one of them. But the bottom line question for the judge is the best interest of society with regard to this particular individual. And each case is an individual discrete case. They're not fungible. The bureaucratic system treats them somewhat as fungible assets, but they're all absolutely individual cases and have to be looked at individually. Now, where did the judge go wrong in this case? Well, Your Honor, in this case, evidence that was before the district court was that under the adult system and under the juvenile system, the juvenile system required or provided mandatory substance abuse treatment, and that included within it anger management and so forth. Under the adult system, however, the treatment was not mandatory. Rather, it was voluntarily, and it only fell under the auspices of the RDAP program, Residential Drug Abuse Treatment Program. And under the law at the time, the administrative law at the time, the only eligibility requirements for Mr. Sutherland would have been that he be within 36 months of release. In other words, he had to have been within 36 months of release in order to have qualified for that. That applies across the board to adult? Yes, yes. But as I was preparing for this hearing, I noticed that two weeks ago or three weeks ago, the law changed, wherein the Bureau of Prisons no longer has that 36-month period. But the, in other, instead of that, require a community-based transitional treatment program. So the effect is that regardless of whether it was under the 36-month eligibility or the community-based treatment, transitional treatment program, he still does not qualify. He doesn't meet the criteria for participation in the RDAP program. So the functional difference is that Mr. Sutherland, if prosecuted and dealt with as an adult, will never be eligible for substance abuse. What does the record show about his necessity for substance abuse treatment? He had some history of juvenile drinking. Yes. But was there a specific connecting of the dots to make substance abuse treatment availability relevant in the judge's examination of this case? Yes, Your Honor. The relevancy is that, first, the offense occurred when he was drinking and under the influence. Well, that's the offense of which he's charged. Right. Drinking was involved. Right. That's a given. Yeah. And then the other evidence is the, I mean, there's numerous reports from professionals who evaluated him, and they all determined, for the most part, that he would benefit from substance abuse treatment. Were there any substances other than alcohol? Marijuana, as well, and tobacco. If we're going to give your co-counsel five minutes and save five, we're beginning to run out of time. Okay. Thank you, Your Honors. My name is David Ness, and I represent Mr. Jordan Damani. Is there any reason why we should? We've been using initials up to now. Oh, JDS. I'm sorry. We're using them, but is there any reason why we have to now that they're old enough to go public? Judge Goodwin, I guess I would disagree that they're old enough to go public. They're still within the juvenile system. They haven't yet been transferred. As I set out particularly, I had these two appeals going, and in the first appeal I filed that having to do with propriety of holding him in an adult jail. And going through the Juvenile Delinquency Act, it's clear that he can remain within the juvenile system until up to age 26, as long as he's originally charged as a juvenile. So, yes, he is a juvenile, and that's one of the protections. As long as we can keep track of him, it doesn't matter whether we use the names or not. Initials apply. It's just these titles, U.S. v. Juvenile Male, we've got I don't know how many of those cases. But initials will do. Google it to get a thousand words. Or you try to cite him in briefs, and you're called a juvenile male. Your Honors, over four years ago, when my client was evaluated by the court-appointed experts as well as his own experts, they all came to unanimous agreement that this was a kid that can and should be rehabilitated. He came from just indescribably horrible background, had problems that you would expect as a result of that background. But everyone believed he should be rehabilitated. Four years ago, I thought, based upon the fact that the government bears the presumption, bears the burden of persuasion here, and there's a presumption in favor of juvenile treatment that JCD should stay within the juvenile system. I guess as a federal defender, I'm used to losing, but I thought this was a case I should probably win. It started out, and it may be that I've gotten too close to the case, but it started out as, I think, just looking for legal justice. And it's gotten to the point now where I think I really am asking the court for human justice here. The way JCD has been handled and been treated within this system over the past four years is shocking, I guess, to me. It's the best way I can explain it. Just as you're aware, we're a court of law. We have to deal with the confines of the law, what Congress requires, what our case law requires. And whatever the accuracy of your perception and whether or not we agree with that, we, in determining whether a judge hadn't erred, we have to point to something in the record that indicates that he did err and that would permit us to give you the relief or your client the relief you seek. In this case, it seems like, at least in this round, the focus seems to be primarily on the rehabilitative aspect of this. In the first round, or actually the round that this panel heard before, the judge made certain determinations that were factually incorrect, and we sent it back for redetermination with an instruction that it would be manifestly unjust to treat the two different people, J.C.D. and T.J. Assing, as it is, differently because they rose out of common facts. What did Judge Haddon do or not do that was violative of that mandate or that was based upon facts that were clearly erroneous that would give us the legal right under our system of law to grant your client the relief you seek? Well, I say, I mean, the first most obvious thing is that when I went back, Judge Haddon sua sponte informed counsel that he was going to reopen the record. I objected to that. I objected to that strenuously. But we told him he was to be involved in other proceedings, right? So what's wrong with that? Even assuming that he didn't exceed the mandate in that case. The question was, is how do you treat T.J.S. and J.C.D. differently? He reopened my case. He refused to reopen T.J.S.'s case. They were treated completely differently. And you view that as being violative of the mandate that we gave that these two should be treated equally? I certainly think so. You know, the objections that I filed, and I filed objections arguing, you know, a number of different grounds. One, that he hadn't gotten treatment, so it wasn't fair when he was not given appropriate treatment, he was kept in isolation, to then turn around and use his misconduct reports against him when, as I say, he hadn't gotten treatment. And then what Judge Haddon did was he just simply, he skipped my objections, denied them his mood after he went ahead and used all of them. And I respect and appreciate that. But can you, aside from the fact that Judge Haddon reopened the hearing as to your client's situation and not to T.J.S., what else did he do that you believe was either violative of our mandate, or which you believe, or were there facts that he found that were clearly erroneous? I think that there were facts that he found that were erroneous. Okay, what were those facts? Well, there... The ones outlined in your brief? The ones outlined in the brief. When he says that J.C.D. received, you know, all of the treatment he needed, and the facts did not show that. Not because he was in martial hold? That was A, because he was in martial hold, and B, because he was held in protective custody for whatever it was,  There was some indication that because he had gotten into some trouble, there would have been times he would have not been able to go to treatment. But this kid was held in isolation for months and months and months at a time, when the record shows that during, you know, six-month periods, he didn't have any write-ups whatsoever. And a lot of these write-ups that he did have were for, you know, small things, cursing at a guard or something of that nature, which the government's witness, Darryl Cash, said, you don't lock a kid away for long periods of time for that kind of conduct. You know, in reading through some of the old cases, I was reading an old 1987 case authored by you, Judge Goodwin, and I think Judge Ferguson filed a concurrence to it. It's the Gary H. v. Hegstrom. And back over 20 years ago, you know, this Court was talking about how improper it is to keep juveniles in isolation for long periods of time. Yeah. Well, this has bothered me in this case, too, but some of that is probably the fault of the bureaucracy of our own Court, and the delay in these appeals being strung out over quite a bit of time. And perhaps that's true, but then should JCD then bear the brunt of that prejudice and have the Court say, well, he can no longer be rehabilitated because we kept him under these illegal, unconstitutional conditions, conditions that are known to ‑‑ I mean, his crawling up in the ceiling and hiding out and stuff like that is part of his behavior problem, but ‑‑ and probably might be treatable for all we know. But some of those write-ups were of his own confection, not necessarily caused by the tapers. Some of them were, but if I can quote from Gary H. Hegstrom's case, it states, long‑term confinement makes detainees angry, depressed, frightened, self‑destructive, and violent. And that was what the District Court found, what essentially this Court affirmed, that that sort of treatment of juveniles causes known behavioral sort of problems. Remember, JCD didn't have any write-ups for whatever it was, six months or something when he got to Rio. And then he had those four. He gets to Dakota Horizons, and again he goes four or five months without any write-ups. And the other interesting thing is that if you look, a lot of his write-ups tended to correlate with things that were going on in his case. There was one time, one of the more serious ones at Rio. I think it was a day that I argued in front of this Court. He tried to call me, he couldn't get in touch with me, and the anxiety got to him. The kid has problems, no doubt about it. I mean, you read his background. The kid, he needs help. He knows that he needs help. There's help that he hasn't gotten, but if he gets that help, he can be rehabilitated. And that's what the evidence has shown, and that's what the evidence showed four years ago, and that's what it continues to show. All right. I think we'll give you five minutes to rebuttal, but thank you, counsel. Lori Sick for the United States. To clear up, T.J.S. Thomas is in Marshall Hold custody, but he is in the reintegrating youthful offenders or Rio facility. He is there to this day, and he has been there throughout this process because he is not turned 21. Are rehabilitative services available to him? Yes, they are. And what are those? They are the whole panoply that is allowed to everybody that's adjudicated as a juvenile in that facility except for, so it's substance abuse, mental health, education, recreation, obviously medical. You say except for or including? That is what is allowed, but he has been in a protective custody status, as was J.C.D. when he was at the facility. They had to segregate them because of relatives of the victim being there. So although some components of this treatment involve group activities, they had to modify that because they had to keep them segregated from people who would hurt them. They also, because they're Marshall Hold and the facilities make this determination as the deposition of the Marshall person, Kara Wessel states, it's not anything the Marshall service is doing. But the facilities, because they don't know when they're going to be moved, they don't do the full-blown evaluation of them when they come in, and so they don't have the group activities. Can I change our focus just for a moment? Yes. As you know, in our previous mandate, we stated, and I'll just very briefly follow through, in this case it would be, in quotes, manifestly unjust to overlook the errors in one defendant's transfer order when those same errors constituted abuse of discretion in the transfer orders of similarly situated defendants. In this case, you have two individuals who were involved in an, they were allegedly involved in a cruel murder of somebody. Yes. At this point, you have, they seem to be going their different ways procedurally. Basically because of age at this point, but I think they've converged at this point. Do you believe the record shows that Judge Haddon, in fact, treated their situations in accordance with our mandate? He did not allow TJS to have an additional evaluation, which is something that was done in JCD's case. Now, why was that? He believed, the way that I believe he thought this, TJS's case was postured, was more like, I'm trying to, I was trying to think of an analogy, and this is the best I could come up with. He believed TJS's case was like an amyline remand, and JCD's case was more like a resentencing. Because Judge Pollack had authored an opinion that had addressed most of the factual and legal issues in the case, he was focused on a much more limited extent in TJS's case. You know, he was focused on the first remand as opposed to the second remand. Well, in your remand, you found two erroneous findings that constituted manifest necessity, the one being that he had compared TJS as he'd done in other orders to other Native American youth, and two, he said that there was no evidence in the record about the comparability of juvenile programming and adult programming. So how he responded to your order with respect to TJS was to take testimony and put it in the record about the availability of programming for TJS. And then he extracted the one finding. He did not allow a re, there's no doubt that he did not allow new and updated evaluations. And he didn't, he didn't commit an evaluation of either of these two defendants individually, did he? He did. He did. There was a reevaluation of JCD after your last opinion. But not TJS. And it was, but I need to be clear, it was an evaluation that was done of JCD by his expert. He was not sent out for a new court-ordered evaluation, but a new and updated evaluation was done by JCD's expert. And he had that, and then he took testimony from the director of Rio. To give you an idea, Montana, we have two juvenile facilities that mainly the juveniles go to because of location. Rio, which is in Galen, Montana, and I'm going to go by the shorter title, Dakota Horizons, which is in North Dakota. So those are the two facilities we're talking about. The evaluations were done at Dakota Horizons. Both juveniles, well, JCD has been in both facilities. TJS has been in Rio. So then he didn't have an evaluation, per se, of JCD, but he took testimony from the directors of both of those facilities. And let's go to a larger issue, because this is one that I frankly really struggle with. The statute that gives the district court the discretion as to whether someone should be tried as a, charged as a juvenile or prosecuted as an adult. Places an emphasis, in part, on rehabilitation. In large part, I think. Yeah, exactly. In this case, Judge Haddon has universally chosen the adult approach. And yet, if these young men are convicted, it's a mandatory life sentence, right? The way they're charged right now, that is absolutely correct. So there would be no possibility of rehabilitation under the current regulations, is that right? If they are convicted as adults of first-degree murder, it is mandatory life without any of the auctions that I talked about. So by definition, isn't Judge Haddon saying if he sent, you know, again, we don't know whether they're guilty or not guilty. But sending them into the system, isn't there a presumption that if they were found guilty, there is no possibility of rehabilitation on the part of either young man? I understand exactly where you're going with this, Judge Smith. And what I think that we have to do, whether you agree with me or not, is to step back. Because the transfer decision at this stage doesn't have that crystal ball. And that's not what the judge is. It doesn't, in some respects. On the other hand, on the shoulders of the district judge, to a large degree, rests this issue. It does. It seems to me, again, I hate to say this because we're talking about human beings here, but as an intellectual matter, this seems to clash to me. On the one hand, you have the rehabilitative issue, which is crucial in this case, and which we have highlighted. Absolutely. On the other hand, you've got the judge who seems hell-fire determined to send these two young men, if they're convicted, to jail or life without possibility of parole and without any rehabilitative possibility. Well, and I would have to tell you, Judge Smith, that with the way that this case is postured, you'd have to put the United States in that category as well, that we're hell-fire bent on doing that. And I'd like to be able to explain that. That's good to know, actually. Well, I want you to know where I'm coming from. I'm an Indian country prosecutor with 14 years of experience. This is the first case that I have ever moved for a discretionary transfer. So when you're talking about what's on the shoulders of the district court, which is also on the shoulders of the United States, we have to look at these juveniles. And in this case, the district court also has on his shoulders some pretty strong evidence about what crime they committed. And with respect to Mr. T.J.S. Sorry, I just broke those initials. We have the same problem. With respect to T.J.S., the evaluations weren't that good about whether he was amenable to treatment. With respect to J.C.D., he'd had a terrible history, treatment that was wholly unsuccessful. And that was weighing the district court as well. I am here to tell you, the government knows the charge here carries mandatory life. But we've said it in every way we can say it without saying it straight out. So we'll say it today. We're not looking for a mandatory life sentence in this case. That is the crime that was committed. This was a premeditated murder in our view, if you believe our evidence. And that's why we charge that offense. But if when you move into what jurisdiction does the district court have, which is the question that is answered in transfer. Is it jurisdiction for juvenile adjudication or jurisdiction for adult? But you do agree, do you not, counsel, that if they are tried and if the government doesn't change the charge, there is no possibility of rehabilitation? There is no possibility of rehabilitation. But the government would not be serving its client or justice if we didn't change the charge and add second-degree murder to this case. And I in no way suggest this wasn't a heinous, heinous crime. But as you know, in our role as circuit judges, we have to look at the bigger picture as well, because what we do in this case may affect lots of other cases as well. Absolutely. And because of that, I mean, I'm sure you've seen a lot of these recent discussions, scholarly and otherwise, about young people. In this case, we'll take TJS, 15 years old, according to the record, seemingly, you know, he's got some issues with some marijuana, some drinking and so on. But he doesn't seem to be, unlike perhaps the other young man, he doesn't seem to be a ringleader. He doesn't seem to be much. He's just kind of a kid hanging around the reservation. I think you've described exactly the position of the United States, sir, which is it has always been a closer call for us with respect to TJS. But his life, his life is on the line here. It is. If he is tried as an adult and if he is found guilty, he will spend the rest of his life in jail, probably in a max prison, without any possibility of rehabilitation, without any other chance in his life. Is that justice? It is not justice. And that's why I'm telling you that the government is not. If we get adult prosecution, that changes the framework that we have to deal with. And what is the reality for the government now? It is that we do have a case that's 4 years old. We have, first of all, JCD, who's cooperated. He, in large part, is why we even have TJS in this case. That is one way to break a mandatory minimum. If first-degree murder was what he was convicted of, quite frankly, that seems an impossibility to the government at this point, not only because of the state of the evidence, because of what has been brought up about these kids, these men now, in the interim. All of the arguments that would be made to mitigate first-degree murder to a jury, if we didn't plead the case, which is certainly something that we would do. We appreciate this part for you. The lesser-included crimes are available. They are available by plea. There would be no trial here where the men representing these juveniles wouldn't ask for those lesser-included offenses if we ended up going to trial. And to be quite honest with you, if we did get a transfer order here, we would have to look, as the government, as to whether we could actually indict on first-degree murder now with the state of the evidence. This, there is certainly a confession from JCD, but the witnesses in this case were all, this was, to a certain extent, there's strong evidence in this case. But as a trial lawyer, I will tell you, confessions only go as far as the other evidence supporting it. And we don't have a lot. So we'd have to make that decision. This may seem strange at this stage of the proceeding, but one of the things I have learned is that there are settlements in a civil setting, mediations and so on, that happen. Is there any possibility that the government and the defense counsel can sit down together and work this out in a way that will do justice before we rule on this matter? I would love to be able to do that, but I'm not sure that the court wants to do it in the way that the United States is willing to. We're not telling you what to do. It's not the court. The question is whether you, the United States, and defense counsel could work out an arrangement. We do have, either with or without the assistance of a mediator, we have an excellent mediation service, and they've even mediated a capital punishment case. So they do criminal work? Yeah. I understand. I've only done it in the civil context. We've mediated the Wen-Ho Lee case. Okay. The government would be very willing to do this. I think you can sense we would all encourage the government and the defense counsel to seriously consider it. We cannot compel it, but it's obvious from your concerns, your comments, you, too, sense the issue of justice that we're dealing with here. Absolutely. And so you can do things in mediation that are fine-tuned that we can't do at this level. Well, let me add two things to that. When you said it would satisfy the court, the mediation doesn't involve satisfying the court. A mediator may facilitate an agreement between the two sides, but the court has nothing to do with that, is not satisfied or dissatisfied. Furthermore, if mediation does not succeed, we are not notified about anything about the process or who declined or who agreed. All we know is that mediation did not succeed, and we go back to where we are right now. Well, the reason why I brought that up, Judge Reinhart, is because I want to be clear from the government's perspective. Whether the court agrees with our interpretation of the statute or not, we're very concerned that there's nothing left in the juvenile system for JCD. There's no facilities to treat him that we know of. So what we would be doing, I know you're saying you're not involved, but I want to be clear so you know where we're going. We're going to be looking for a resolution as an adult. We couldn't serve justice without that. There's no way that the government can see JCD being released at this point. We met what we said. What about TJS? Well, that's a different story. There is time left for him in the juvenile system because he has not turned 21 at this point. He's 19. Well, I think it's about time that we explore this before they get any older. I absolutely agree with you. And let me just say one thing about it. You know, I take everything you said as completely sincere. But let me tell you, you can look at case after case and you try to see where something went wrong. Nobody accepts the responsibility for what turns out to be a horrendous result in some cases. You can read the execution of Private Slovic, for example, during World War II. Well, Your Honor. But wait a minute. But things happen that are not expected at each step. And then the court of appeals says, well, we know it's wrong, but there's no abuse of discretion. And you end up with another one. Well, of course the prosecutor was wrong. Of course he didn't expect this. This is what happened. But we don't have the jurisdiction to correct things because our job isn't justice, it's law. And there's no legal error. But even though nobody wanted this result and we can't find out who's responsible, we have a horrendous result the courts can't do anything about. And despite the fact that the prosecutor may be well-intentioned, once something goes wrong in the system, nobody wants to take responsibility, but everybody says it's not my job to correct it. And everybody says I do law, that's my job, starting with a member of the Supreme Court who says my job's not justice, it's law. No. I would encourage you to listen to my oral argument in Wing and Arcand, which was cited by Mr. Ness. I took responsibility. So please listen to that. All right. Well, we hope we'll have to talk to the other side to see if they see any prospect for mediation. But I hope you will succeed in that. It would relieve us of a great burden. Counsel, you've got five minutes. And let me ask each of you before you start the argument, would you be willing to try mediation with our mediation? And counsel? I would, because based upon some of the things Mr. Stewart said, I have some concerns I can explain. But certainly I would try mediation. All right. Thank you. Maybe the easy part of this mediation is that I just heard the prosecutor in the case say that to incarcerate Mr. TJS for a period of the rest of his life without the possibility of rehabilitation is not in the interest of justice. I mean, it seems to me that's an admission that the motion is not well taken and should be denied. That's the easy resolution. We don't want to be too hard on her. I'm not sure that follows. I think what she said is that if there's a transfer, there would be charges, but they wouldn't be first degree murder. Thank you. Thank you. I guess if I could just maybe just raise a couple points in rebuttal, and then I'll address my concerns about mediation. The first thing, having to do with what I view as the inconsistent rulings as far as whether or not to reopen the record, the judge hadn't reopened the record in my case, and he says it several times in the transcript. He says, I don't think rehabilitation is frozen in time. We've had time pass. We need to have another evaluation because passage of time may make a difference in whether or not this young man can be rehabilitated. Was JCD personally evaluated as a result of that reopening? He was personally evaluated by my expert on this suit. But, I mean, was he reevaluated by the government or by the court or anybody of that nature? No, no, no. Ms. Suick indicated her intention to have him reevaluated, but that never happened. She called, as she said, the head of the Rio juvenile program, and she called a psychologist from Rio and head of Dakota Horizons to testify, essentially, as to his conduct. Did the court clarify what it meant by the rehabilitation evolves, you need to look at this? It seems somewhat incongruous to say we really need to relook at this, and yet the government doesn't do anything, the court doesn't do anything, the defense counsel does. Does that strike you as being inconsistent with what the court said? Yeah, I think it's inconsistent. I had him reevaluated because, of course, I, well, for one, I figured the government was going to have him reevaluated. I thought I should have him reevaluated by the same person. Did the government or the court state anything in the record as to why no reevaluation was done of JCD personally as part of Judge Haddon's reopening of this element of the hearing? No, no, not that I recall. Just a second point, Judge Smith, you indicated that my client was, I think you referred to him as perhaps a ringleader here. Well, I don't mean to, I didn't mean to sound pejorative. What I meant was he was the older of the two defendants here, seemingly had a more troubled past. So I'm not in any way trying to paint your client in a way that is adverse. I'm simply, based upon the record, it appears as the older of the two, the more apparently troubled of the two, he seemed to play more of a role. Ringleader is probably a little harsh. Well, I guess the other point I just bring up is that this whole thing wasn't even his idea. This, you know, according to what the FBI agent testified to, there were two others that came up with this, hatched the plan as it was called. He was kind of along for the ride. So as far as mediation, I guess as I've argued, I think that the juvenile system is available for JCD. How old is he now? He just turned 22. But the statute allows juvenile detention until age 26. The Bureau of Prisons, as I submitted in the supplemental brief, has a policy whereby they say if a juvenile is sentenced to their birthday, then they don't get credit for time served. I would tell the Court that they need to do that. I don't understand that. I wanted to ask you. I read the supplemental brief. I thought you could keep somebody in juvenile detention until they were 26. So what does credit for time served have to do with it? I mean, suppose you say, well, I want to keep him as long as we can, and that's until he's 26. What kind of credit are you going to give for time served? Well, I think the question came up probably from the other panel or something. They sent out an order and they asked whether or not TJS and JCD had to be given credit for time served. And so that was the question I was trying to answer. Yeah. But practically, he could be kept until he's 26. He could be kept until he's 26. Okay. So they don't have to give credit for time served because then he'd be out almost immediately. Right. Right. Which would give him another four years. So he could be kept in juvenile detention for another four years or so? Yeah, basically another four years. And how long has he been in already? He's been in already for four years. Okay. So, I mean, he would be in custody for eight years. The only difference is that he would finally start receiving some sort of treatment in these latter four years. Whereas the co-defendant could be kept for 11 years. Yeah, in total, I would assume. In total, right. But in any event, all these things are something you can discuss with the government and the mediator. And, you know, even the alternative, which the government now says is not a real one, would be mandatory life. But, you know, I don't know how the federal system works. I know in California when you get convicted of second degree and your sentence then is, say, 20 to life, 15 to life, it really means life. At least under the governors we've had recently. So it really, as far as serving a life sentence, it doesn't matter whether it's first or second. I don't know how it works in the federal system, but those are things that you would obviously have to discuss. Well, I think that we are probably all encouraged by the idea that you're at least willing to discuss some kind of possible resolution. And if not, we'll go back to where we are at the moment. But is there anything further you wanted to say about legal issues? I guess the only other thing I'd have to say is, you know, as I mentioned at the outset, there are two appeals here. And I think that first appeal where in the District of Montana they take juveniles and they stick them in to an adult facility, and particularly under the conditions that if they're charged with a crime such as murder, they're put in. That keeps happening. It keeps happening and it keeps happening. Let me ask you about that. Are you saying they put them in before there's a transfer order, that part of the transfer order is to put them in adult facilities? Yes, and that's what they did with JCD. And so when they moved him back to Cascade County, they put him into the adult facility. He was put in because of his charge and because he was a federal hold. He was put into maximum security, which meant that he was held in isolation for 23 hours a day. The one hour a day he got out of his cell, he was kept alone in the day room, fully shackled in belly chains and leg irons. And these things, it's happened to two of my clients now. It just keeps happening. And what is your theory, that they cannot be transferred to an adult prison until they're convicted or? As long as they're a juvenile. As long as they're a juvenile. Even if they're convicted as adults, while they're under the age of what? No, well, if he's transferred or if he's convicted as an adult, then yes, he can go to an adult jail. That's not the problem. But as long as he remains within the juvenile system, the statutes make very clear that he cannot be placed into a facility where he has regular contact. Well, you said if he's transferred or if he's convicted. Well, he was transferred, wasn't he, under Judge Haddon's order? He was transferred. But go back to, is it Nelson, the first case from this court where you said you can have an interlocutory appeal from an order of transfer. And one of the reasons given was that a juvenile would face a distinct possibility of waiting out his appeal in an adult facility. And that is a harm that could not be. So you're saying he can't be put into an adult facility until any appeal from the transfer order is exhausted. I would say yes, at least until it's finished with this court. And he was put into the adult jail before Judge Haddon ordered transfer. This is just what they do. The hearing that I had where I went in and we had the witnesses and the testimony and the conditions that he was under, that all happened before Judge Haddon. Well, who makes that decision to put him into an adult facility before there's any kind of transfer order? It's the United States Marshals, I believe, who makes the decision. And I went to Judge Haddon and asked for relief from that and asked that he, in my words at the beginning of the hearing was, maintain the status quo. He's a juvenile right now. Take him out of the adult facility and particularly out of the conditions that he was held under. Are the U.S. Marshals Service before us in this case in your second appeal here? No, no, no, they're not. And I read United States v. Howard, and that was the Shackling case, and they indicated in there you didn't have to bring a separate proceeding. At least as one judge, I would encourage you, I think I read your body language about the mediation, but I would encourage you to remember the concept that perfection can be the enemy of the good. Don't hang on technicalities. Remember, you're dealing with a real, live person here. Don't hang on perfection. I understand that, Judge. Thank you. All right. Thank you all very much. I hope we won't have to see you again. Nothing personal. No. All right. The case just argued is referred to mediation. Thank you. Thank you.
judges: Fletcher B. , Tashima, Thomas